```
1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                   JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA       Case No. 3:22-cr-144-WWB-PDB

4  v.                             October 1, 2024

5  MEGGIN ANNE EVANS,             1:37 p.m. - 3:22 p.m.

6       Defendant.                Courtroom 12A
   _____

7
                            SENTENCING
8
            BEFORE THE HONORABLE WENDY W. BERGER
9               UNITED STATES DISTRICT JUDGE

10                    A P P E A R A N C E S

11 COUNSEL FOR THE GOVERNMENT:
   ASHLEY WASHINGTON, ESQUIRE
12 United States Attorney's Office
   300 North Hogan Street, Suite 700
13 Jacksonville, FL 32202

14
   COUNSEL FOR THE DEFENDANT:
15 WAFFA HANANIA, ESQUIRE
   Federal Public Defender - MDFL
16 200 West Forsyth Street, Suite 1240
   Jacksonville, FL 32202
17

18 OFFICIAL COURT REPORTER:
   Katharine M. Healey, RPR, RMR, CRR, FPR-C
19 PO Box 56814
   Jacksonville, FL 32241
20 (904) 301-6843
   katharinehealey@bellsouth.net
21

22

23                        (Proceedings reported by stenography;
                           transcript produced by computer.)
24

25
```

1                              I N D E X

2   DEFENDANT'S PROFFER................................... PAGE 7

3   STATEMENT BY TERESA EVANS............................. PAGE 21

4   STATEMENT BY GARY EVANS............................... PAGE 25

5   STATEMENT BY THE DEFENDANT............................ PAGE 29

6   GOVERNMENT'S PROFFER................................. PAGE 34

7   DEFENDANT'S REBUTTAL PROFFER......................... PAGE 45

8   IMPOSITION OF SENTENCE BY THE COURT.................. PAGE 54

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2     October 1, 2024                                    1:37 p.m.

3                              -   -   -

4          COURT SECURITY OFFICER:  All rise.  The United States

5     District Court in and for the Middle District of Florida is now

6     in session.  The Honorable Wendy W. Berger presiding.

7          Please be seated.

8          THE COURT:  I just need to get my computer pulled up.

9        (Pause in proceedings.)

10         COURTROOM DEPUTY:  Case No. 3:22-cr-144, *United*

11    *States of America vs. Meggin Anne Evans.*

12         Counsel, will you please state your presence for the

13    record, beginning with the government.

14         MS. WASHINGTON:  Good afternoon, Your Honor.  Ashley

15    Washington for the United States.  And seated with me at

16    counsel's table is Special Agent Ben Luedke with Homeland

17    Security Investigations.

18         THE COURT:  Okay.

19         MS. HANANIA:  Good afternoon, Your Honor.  Waffa

20    Hanania with the Federal Defender's Office here on behalf of

21    Ms. Meggin Evans, who is seated to my right.

22         THE COURT:  Meggin Anne Evans, can you raise your

23    right hand for me, please.  Do you swear or affirm that the

24    testimony you should give in this cause should be the truth,

25    the whole truth, and nothing but the truth, so help you God?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  You can put your hand down.

3          Ms. Evans, back on March 1st of this year, 2024, you

4    entered a plea of guilty to Count One of the indictment,

5    charging you with production of child pornography, in violation

6    of Title 18 of the United States Code, Sections 2251(a) and

7    (e).

8          The Court has previously accepted your guilty plea,

9    has adjudged you guilty of that offense, and now we come to the

10   point in time where the Court imposes sentence.

11         Before we do, let me go over what I have reviewed.

12   And I checked again this morning to make sure I didn't miss

13   anything.

14         I have reviewed the indictment, the plea agreement,

15   the presentence investigation report and all the attachments to

16   the presentence investigation report.  I have reviewed the

17   Notice of Submission of Materials for Sentencing that was filed

18   on your behalf by Ms. Hanania, which included a number of

19   letters and other records, including the judgment in your

20   codefendant's case.  The motion to seal and all the attachments

21   that were in the motion to seal.  And I think there were two

22   submissions that I saw in that regard.

23         Is there anything that I may have missed that I did

24   not --

25         MS. HANANIA:  No, Your Honor.

1          THE COURT:  Okay.  Anything from the government?

2          MS. WASHINGTON:  No, Your Honor.

3          THE COURT:  Okay.  Now, Ms. Evans, did you have an

4    opportunity to read and go over the presentence investigation

5    report with your attorney?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Are there any objections to the factual

8    accuracy of the report?

9          THE DEFENDANT:  No, ma'am.

10          THE COURT:  Okay.  And are there any objections to

11    the probation officer's calculation of the guidelines?

12          MS. HANANIA:  Your Honor, if I just may, we don't

13    have -- I don't have objections, per se.  I am going to ask

14    Your Honor to consider an argument in mitigation in reference

15    to paragraphs 38 and 39, which deal with a four-level increase

16    for basically the same set of facts, so it's not an objection,

17    per se, but I will address it in my argument.

18          THE COURT:  Okay.  Any objection from the government

19    to the calculation of the guidelines?

20          MS. WASHINGTON:  No, Your Honor.

21          THE COURT:  All right.  Ms. Evans, any objection to

22    the calculation of the guidelines?

23          THE DEFENDANT:  Just what Ms. Hanania said.

24          THE COURT:  Okay.  All right.  So finding no

25    objections to the factual statements or the guidelines, I'll

1   adopt the guidelines as they -- the facts and guideline

2   applications found in the presentence investigation report.

3           What I show -- what I have is a Total Offense Level

4   of 39, Criminal History Category of I, a guideline range of

5   262 months to 327 months, a supervised release range of between

6   five years and life, restitution calculated at this point at

7   $45,500, a fine range between $50,000 and $250,000, there's

8   that $100 special assessment, and then there are the -- there's

9   the AVAA assessment, which is not more than 50,000.  But we can

10  discuss that when the time comes, and whether she has the

11  ability to pay that.

12          Is that what everybody has?

13          MS. WASHINGTON:  Your Honor, I think something

14  missing was the Justice for Victims of Trafficking Act

15  assessment for $5,000 for non-indigent defendants.

16          MS. HANANIA:  Your Honor, the only other thing that I

17  think that we would want to address up front is the fact that

18  Ms. Washington and I have discussed the issue of restitution.

19          Given that Ms. Evans didn't possess or download any

20  images, the images referenced in the PSR have to do with her

21  codefendant's phone and his actions, and it's my understanding

22  that we're in agreement that restitution isn't -- is not

23  appropriate in Ms. Evans' case.

24          MS. WASHINGTON:  Yes, Your Honor.  Although Ms. Evans

25  was charged with receipt, the nature of the particular image

1    she had was tied to the application Mega, and so it was really

2    more of a screenshot of available images that would not allow

3    for them to be identified.  So there would really be no way to

4    assess restitution with the victims under those circumstances.

5           I think those are, as Ms. Hanania said, largely tied

6    to Mr. Smolinski and the images and videos associated with him

7    rather than Ms. Evans.

8           THE COURT:  Okay.  All right.

9           Anything else?

10          MS. HANANIA:  No, Your Honor.

11          THE COURT:  Any reason why we should not proceed to

12   sentencing at this time?

13          MS. WASHINGTON:  No, Your Honor.

14          MS. HANANIA:  No, Your Honor.

15          THE COURT:  Okay.  Then I'll hear anything that you

16   wish to offer in mitigation.

17          MS. HANANIA:  Thank you, Your Honor.

18          First I'd ask Your Honor to take a look at the

19   courtroom and take a look at the amount of support and love

20   that Ms. Evans has behind her, not just today, but going

21   forward from today.  We're asking Your Honor to take note of

22   that because we believe that it is an important factor in what

23   an appropriate sentence should be in this case.

24          In the audience you have her mother, Teresa Evans;

25   her grandparents, Gary Evans and Gloria Evans; as well as her

1    mother-in-law; father-in-law; aunt; brother; and friend of the

2    family.

3          All of these people are here in spite of what

4    Ms. Evans did in this case, which all of them find abhorrent

5    and disturbing, but which they also find to be really at odds

6    with what they know of her character both as a family member

7    and as a mother.  And I would ask Your Honor to consider the

8    importance of that factor as well.

9          None of us are the sum total of the worst thing that

10   we've ever done.  Now, the worst thing each of us may have done

11   may differ in severity quite widely from the situation before

12   the Court, but still, none of us is the sum total of the worst

13   thing we've done or even the best thing we've ever done.  We're

14   all a chaotic mix of different elements, and Ms. Evans is no

15   different.

16         She has been racked by regret ever since she was

17   arrested in this case.  When she first -- when they first began

18   investigating Mr. Smolinski, law enforcement talked extensively

19   to Ms. Evans, and she was forthright and forthcoming with them.

20   Indeed, a lot of the information that they have is because of

21   the statements she made during their many conversations with

22   her.

23         She has been filled with regret and has been seeking

24   redemption until today, and as she will continue to seek

25   redemption going forward.

1        We are going to argue, Your Honor, that given the

2    totality of the circumstances in this case, including a

3    comparison to Mr. Smolinski's sentence, that a 15-year

4    sentence, which is the minimum mandatory that the Court must

5    impose, is sufficient, but it's not greater than necessary to

6    address the purposes of sentencing.

7        We would argue that while this is a serious offense,

8    that someone without any prior criminal history at all,

9    15 years is sufficient, but not greater than necessary, in this

10    case.

11        Who you have before you, Your Honor, is a young woman

12    who was psychologically traumatized by repeated incidences in

13    her childhood and developmental years, who found herself in a

14    dysfunctional marriage to a controlling and oftentimes abusive

15    man.  She found herself in a marriage where physical and

16    emotional love and affection became less and less frequent in

17    distance, to the point of it becoming nonexistent.  She became

18    a woman desperate to save her marriage, and as a person who in

19    many ways was still immature in how she addressed the most

20    difficult problems in here life, she made bad decisions as to

21    how she might do that.

22        She suffered years of infidelity at the hands of her

23    husband and was made to feel smaller and smaller because of his

24    emotional cruelty and his sometimes physical cruelty.

25        Finally he told her the horrible truth.  It appears,

1   based on both the facts of Mr. Smolinkski's case as well as

2   things that Ms. Evans has shared, that Mr. Smolinski had a

3   sexual interest in a number of things:  sexual relations

4   outside of marriage; sexual relations in a home sexual setting;

5   and, unfortunately, worst was the sexual interest in children.

6          Ms. Evans had herself been victimized in several

7   different ways as she grew up, and never really fully addressed

8   any of those, never really received counseling.  And what may

9   come across as single lines in the PSR doesn't really do

10   justice to the things that she experienced.

11          Becoming and encouraged to become sexually active by

12   an early boyfriend's parents at an age of 13, when that should

13   have been the farthest thing from their minds.  And not only

14   encouraged, but put in a situation where it was made easy for

15   them to do this.  And for her parents to really, unfortunately,

16   have no idea until many years later.

17          To be victimized by your colleagues and classmates by

18   being placed under the influence and then being taken advantage

19   of in terms of sexually compromising photographs being taken of

20   you and having to suffer the embarrassment and the trauma of

21   that.

22          Unfortunately, Ms. Evans, instead of trying to or

23   even being aware of the fact that she could seek mental health

24   counseling for those things, turned to an early use of drugs

25   and alcohol that continued throughout her life.  And even as

1  her mental health issues became worse and worse, her abuse of

2  drugs and alcohol followed along.

3          Because of her attempts to disassociate the things in

4  her life that caused her the most pain and distress, she did

5  that to a certain degree with the news that Mr. Smolinski gave

6  her about what his real sexual proclivities were.

7          And in spite of the fact that she engaged in a lot of

8  talk along those lines with Mr. Smolinski, Ms. Evans wants it

9  to be clear that she was never sexually aroused or attracted to

10  children.

11          Unfortunately, and sadly, she did play along with her

12  husband's fantasies, because afterwards, he would become

13  interested enough in a sexual outlet that he basically would

14  turn to her.  It's, quite honestly, sad to think that he then

15  used her as a sexual outlet rather than showing her the

16  intimacy and affection that she was really seeking.  But that

17  was, unfortunately, the situation that she was in.  He would

18  show physical affection towards her after she engaged in this

19  fantasy play with him.  None of her --

20          THE COURT:  That's not fantasy play.  I mean, she

21  sent him pictures of --

22          MS. HANANIA:  She sent one picture, Your Honor.  And

23  I am going to get to that.  And I agree.  I'm addressing now

24  the talk, because I do believe that that talk perhaps paints

25  her conduct as being more egregious.  It was wrong and

1    egregious, we agree, but it perhaps paints it as more egregious

2    than the single photograph actually was.

3         She's never touched a child inappropriately.  She's

4    never downloaded photographs.  And none were found on her phone

5    except for a limited file that he sent to her.

6         We included in our materials a report from

7    Dr. Rohrer, who did an evaluation of Ms. Evans, who does talk

8    about both the traumas that she encountered during her

9    developmental years and how Ms. Rohrer's [verbatim] behavior

10   sort of developed in terms of her offense conduct in this case.

11        The most important factors we would ask Your Honor to

12   consider is that Dr. Rohrer indicates that female sexual

13   offenders have extremely low rates of sexual recidivism, less

14   than 3 percent, and that there is no evidence of any antisocial

15   personality disorder in her evaluation of Ms. Evans.

16        The behaviors that she's accused of happened within

17   the context of her marriage, in which there were significant

18   intimacy deficits.  Dr. Rohrer's experiences and her opinion

19   is, is that females who sexually offend within the context of

20   an intimate relationship typically are emotionally dependent --

21   which I think it's clear from all the facts and circumstances

22   that Ms. Evans was -- socially isolated, and have very low

23   self-esteem.  Such female offenders are typically coerced into

24   sexual offending by fear and dependence upon their male

25   co-offender.  And those factors make her a very low risk for

1    re-offending in the future.  We would argue that that's an

2    important factor for Your Honor to consider in determining an

3    appropriate sentence in this case.

4            We do agree, and Ms. Evans takes responsibility for

5    the fact that she did take one photograph of her child during a

6    diaper change in a moment of madness and deleted it almost

7    immediately thereafter.  And that is the only affirmative

8    action that Ms. Evans took in reference to the facts of this

9    case.

10            THE COURT:  But she sent it for the purpose of her

11   husband's sexual gratification.

12            MS. HANANIA:  She sent it because he had suggested

13   and was encouraging her to do so.  And she immediately said,

14   "What have I done?"  I cannot tell you the number of times

15   Ms. Evans indicated that after a few moments of thought, after

16   she'd sent it, she's like, "What have I done?" and immediately

17   deleted it.

18            In terms of other images, they were on

19   Mr. Smolinkski's phone, password protected, that she did not

20   have access to.

21            She did try to redirect him into more normal types of

22   stimulation in an attempt to reignite their marriage but just

23   wasn't very successful.  All of the talk in their chats was

24   just that, talk, to try to gain some attention from her

25   husband.

1    Most importantly we would ask the Court to consider
2  the fact that all of Ms. Evans' children were interviewed by
3  Child Protective Services, Clay County Sheriff's Office, so by
4  law enforcement and Child Protective Services, and none of the
5  children -- not only did they not report any acts having been
6  perpetrated against themselves, to my knowledge, there's no
7  indication that there was even any weird things, you know,
8  something maybe less nebulous than an actual act.  But nothing
9  like that was reported either.
10    Since Ms. Evans' arrest the children have been living
11  with her parents several states away.  They are under the care
12  of a counselor for the separation from their parents because
13  they still don't know about why their mother is where she is,
14  why their father is where he is, because both the counselor and
15  their grandparents believe that because of their age, it's the
16  most appropriate thing right now.
17    And so they're in an independent, safe counseling
18  environment and still nothing's been reported.  As well as
19  they're under the care of a pediatrician, a doctor, who is
20  aware of the situation.
21    So I would suggest that Your Honor can feel confident
22  that nothing actually took place with any of these children by
23  Ms. Evans.
24    In considering -- another thing we'd ask Your Honor
25  to consider in terms of a reason for a downward variance from

1    the guidelines to the minimum mandatory is the sentencing of

2    Mr. Smolinski.  He was certainly the instigator of Ms. Evans'

3    actions.  He exposed her to this.  There's no evidence that

4    before he began exposing her to his proclivities that she ever

5    engaged in anything close to this.

6          We would argue, Your Honor, that it would be an

7    unwarranted sentencing disparity for Ms. Evans to be sentenced

8    to significantly more than Mr. Smolinski when his offense

9    conduct included the downloading of hundreds of photographs.

10         So his offense conduct involved the repeated going

11   back to the well, so to speak, downloading over and over, day

12   by day, month by month, hundreds of photographs.  And he was

13   sentenced by Judge Davis to a sentence of 17 years.

14         To have a greater sentence for one photograph and for

15   chat talks that never turned into action would be unwarranted.

16   Her behavior is not more egregious than Mr. Smolinkski's and

17   should not be sentenced as if it was.

18         Even within the realm of those people charged with

19   the production of child sexual abuse material -- and I know

20   Your Honor has been on the bench in federal court for a while,

21   and I'm sure that Your Honor has seen a selection of

22   photographs.

23         THE COURT:  I've seen quite a few.  I can tell you

24   that this is the -- Orlando gets quite a few of these types of

25   cases.

1      MS. HANANIA:  Yes.  And so coming from that depth of

2  experience that all of us within this room have, Ms. Evans is

3  at the low end in terms of the type of image, the number of

4  images, within even that particular group of people.  Her

5  conduct is at the lowest end of the scale, so we would argue

6  that her sentence should reflect that.

7      We're also aware of similar sentences in the Tampa

8  division in which a mother who took sexual images of herself

9  and her child was sentenced to 180 months and ten years of

10  supervised release.  And I could provide that to Your Honor if

11  Your Honor wishes.  But the point I'm trying to make is that

12  given the facts and circumstances, we would argue anything

13  higher than 17 years would be an unwarranted sentence and

14  disparity in this case.  And we are arguing that it should be

15  at the 15 years.

16      We've talked a little bit about Ms. Evans' history

17  and characteristics.  We would argue that the presentence

18  report does a good job of talking about her early life, being

19  born into a military family, as well as the several instances

20  of sexual trauma that she was the victim of, as well as the

21  troubles within her marriage leading up to this.

22      It also does talk at length about both her medical

23  and her mental health issues, which are well documented in the

24  records that we provided Your Honor in our materials.  We would

25  argue that the history and characteristics, the totality of the

1   offense conduct, as well as Dr. Rohrer's report regarding the

2   low risk of recidivism are all appropriate bases for a downward

3   variance from the guidelines in this case.

4          Another thing we would ask Your Honor to consider is

5   the letters from her family.  They show a woman who is

6   remorseful and ashamed.  They describe a person who is caring,

7   generous, and a loving mother of five children.

8          She hid her mental and emotional distress from her

9   family when -- that was probably the worst mistake she made.

10   She was suffering from one crisis to the next.  But all signs

11   point to the fact that Ms. Evans is not a predator.  And so

12   family letters all support that.  They recognize the

13   seriousness of what she did and recognize the struggles that

14   she has had but also say she's warm, caring, unfortunately a

15   people pleaser who often put others ahead of herself.

16          We would argue, Your Honor, that a sentence that

17   includes addiction and mental health issues would go a long way

18   towards addressing the underlying causes of her behavior.

19   Those are also conditions that would address the sentencing

20   purposes of protection for the public, providing deterrence

21   against future offense conduct.

22          Ms. Evans, during what will be either way a lengthy

23   sentence, whether it's 15 years or something else, will have

24   ample opportunity to address her substance addiction issues and

25   her mental health issues and to come out of that as a much

1    better person, much stronger person.

2         We believe that a sentence of 15 years with those

3    conditions provides adequate deterrence and provides adequate

4    punishment and protection for the public and would constitute a

5    just punishment for her conduct in this case.  And as I said,

6    the letters do a very good job of showing those aspects of her

7    character.

8         Her plan for the future is to continue to address her

9    mental health and substance abuse issues, develop the skills

10   that she needs to be able to take care of herself appropriately

11   in the future, and try to rebuild a relationship with her

12   family and her children.  By the time she's released none of

13   her children will be minors, or very close to not being minors.

14   We would ask that regardless of the sentence, that Your Honor

15   make an exception for her to have consensual contact with her

16   children.

17        THE COURT:  I wanted to ask you about that because I

18   did read that, and her parents specifically mention, you know,

19   the children and contact with the children.  Has there been any

20   sort of -- because I looked.  I didn't see any reports or

21   anything from their psychologists or anything that, you know,

22   opined on -- on contact.

23        MS. HANANIA:  I don't -- I'm not aware of any reports

24   from their counselor.  What I can tell Your Honor is that she's

25   been having contact throughout her period of incarceration

1    through phone calls and FaceTime that is supervised by a family

2    member and that their letters do address the children's

3    eagerness to have that contact.  Because it's been supervised

4    by a family member there's no discussion of the facts of the

5    case or what's going on.  It's all about their lives and their

6    homework.  The children look forward and are emotionally

7    disturbed when they aren't able to have contact with their

8    mother.

9           If Your Honor wants to -- I would suggest that Your

10   Honor perhaps provide a precondition to that that asks their

11   counselor to provide a report to Probation indicating that the

12   counselor thinks it's appropriate.  It's my information from

13   talking to Ms. Evans' family is that their counselor does think

14   it would be detrimental to cut off contact.  But Your Honor

15   could certainly require that a report be provided to Probation,

16   and that way you could address that concern.

17          So -- but, yes, we would ask that exception be made

18   for that and that Your Honor make requirements of that

19   treatment, mental health and substance abuse, during her period

20   of supervised release as well.

21          We would further ask Your Honor to recommend

22   placement at Aliceville, which is the closest facility to where

23   her parents currently live.

24          THE COURT:  Is that -- where is that, in Alabama?

25          MS. HANANIA:  I believe so, Your Honor, yes.  It is,

1    Your Honor.

2              THE COURT:  Okay.

3              MS. HANANIA:  One final thing I'm going to ask before

4    I think two, perhaps, members of her family want to address the

5    Court is that the greatest punishment that Ms. Evans is

6    going -- is already suffering from, will continue to suffer

7    from, is the fact that she's never going to be the kind of mom

8    she thought she'd be and that she won't be in her kids' lives,

9    you know, in the way that, you know, most moms would want to

10   be.  That's a punishment that she -- that her own actions have

11   put her in, but nonetheless, it is a significant penalty that

12   she's going to have to live with for as long as her sentence

13   lasts.

14             But we believe with the conditions that we've

15   requested that the sentence that we're recommending would

16   address the purposes of sentencing and would do so in aware

17   that is sufficient -- in a way, rather, that's sufficient, but

18   not greater than necessary, to achieve those ends.

19             May I check, Your Honor, to make sure that they want

20   to speak?

21             THE COURT:  Yes.  Anybody that wants to speak can

22   speak.

23             MS. HANANIA:  Your Honor, Teresa Evans, Ms. Evans'

24   mother, is coming before the Court.  And after that, Gary

25   Evans, her grandfather, wishes to briefly address the Court as

1    well.

2          THE COURT:  Okay.  Come up and just tell us your name

3    for the record.

4          MS. TERESA EVANS:  Yes, ma'am.  My name is Teresa

5    Evans.

6          THE COURT:  And what would you like to say?

7          MS. TERESA EVANS:  Sorry.  First of all, I just want

8    to tell you, my husband would be here but he's home with the

9    five kids.  And we didn't want to disrupt them from their

10   school and the football and the cheer and all the kids' stuff.

11         THE COURT:  I understand.  And I read his letter,

12   so...

13         MS. TERESA EVANS:  Okay.  Awesome.

14         So I just want to thank you for letting me have the

15   opportunity to speak for my daughter.  I had to write it down

16   because there's so many thoughts in my head.

17         THE COURT:  That's okay.

18         MS. TERESA EVANS:  So when these initial allegations

19   and charges were made against her, I was shocked and horrified.

20   Hearing the bits and pieces of evidence, I was really just

21   shook to my very core.  I just couldn't understand it.

22         But over the next two years, with communications and

23   prayer and support, this is what I've come to believe, that my

24   daughter was, and is, again, a kind, generous, loving person

25   who gradually became wrapped up in drug-and-alcohol induced

1  thrill-seeking behavior to cope with mental health issues.  For

2  less than six months she behaved in a way I didn't recognize.

3  I should have, but I didn't.  But I was in Alabama and she was

4  in Florida.  And I don't want you to think that I minimize her

5  actions because I absolutely don't.

6           But she knew she was wrong, and she stopped engaging

7  in these activities on her own, way before even Brandon was

8  arrested or she was arrested.

9           In the last two years I've seen the return of the

10 kind, loving, and generous daughter I knew and know.  She's

11 made the best out of the horrible situation and is trying to

12 move forward.

13          At Christmas she gets money from me to buy the other

14 inmates Christmas presents, like shampoo and soap because with

15 they offer in the jail is not good.  But she can buy that at

16 commissary so that they have a Christmas present in the morning

17 because they have no family.  And that is the kind of girl --

18 woman my daughter is.

19          So I can't speak to the ramifications of the children

20 in the pictures and the videos.  I have no knowledge of that

21 world.  But I can speak to my five grandchildren.  Each and

22 every one of them is a testament to their past.  Despite living

23 in a chaotic environment and being removed from their parents

24 and the trauma of all that, we've only experienced a few bumps

25 along the way.  And they show no signs of damage from their

1   life in Florida.

2           The older three have been in counseling since coming

3   to us.  The younger two are twins and they were three at the

4   time and we didn't think that it was appropriate, but when --

5   as they age up, they will go to counseling.

6           And I had talked -- I've talked to the counselors,

7   all of them, and the pediatrician, about visitation.  You know,

8   initially I thought, I can't let her have contact.  But that

9   would not help her.  It would certainly not help them.  I mean,

10  she calls nearly every day or FaceTimes nearly every day.  She

11  knows their spelling words, she knows their football, their

12  schedule.  She calls to say, "Okay.  How'd you do?"  She's very

13  involved for being in jail.  I mean, I'm amazed at how much she

14  remembers and has with these kids.

15          So anyhow, the older three have been in counseling.

16  And the counselors have told us that they're really wonderful

17  and well-adjusted kids, that there's no indication of abuse or

18  that anything should change.  And none of them have recommended

19  that we limit contact with either parent.  Even -- I mean, even

20  their father talks to them on occasion.  And I'm right there

21  with him and everything is recorded.  But it's important to

22  them, especially the boys, because of football.

23          THE COURT:  Is he allowed to have contact with them?

24          MS. TERESA EVANS:  Yeah.

25          MS. WASHINGTON:  No, Your Honor.  He is not allowed

1    to.  He's not supposed to be having contact.  That was made

2    clear at the sentencing.

3            MS. TERESA EVANS:  We were told that he couldn't

4    video chat, which he has not done.

5            MS. WASHINGTON:  Your Honor, the statement made,

6    because this was actually pushed by his attorney, that they

7    wanted to permit contact, Judge Davis made it clear that he

8    understood that that was the request, but he was saying no

9    contact with minors at all, including his children under the

10   age of 18.  And there was not a carve-out for video versus

11   telephone.

12           MS. TERESA EVANS:  Okay.  We'll not allow that.

13           THE COURT:  Let's not allow that.

14           MS. TERESA EVANS:  I'm sorry, I -- that's for another

15   discussion.

16           So I would just ask, you know --

17           THE COURT:  And I'm not going to hold that against

18   her.  I just wanted you to know that there's -- that that's --

19   I would have been shocked if contact was allowed with the

20   father.

21           MS. HANANIA:  Okay.  Just move on.

22           THE COURT:  So just don't allow it anymore.

23           MS. TERESA EVANS:  Okay.  Thank you.

24           Please let Meggin continue to be the best mother that

25   she can be under these circumstances because she's actually

1  doing really well.  The children all need to know that they're

2  loved and not forgotten.  They've been victimized by the

3  circumstances.  And there may come a day when they choose not

4  to have contact, but I would like for that to be their decision

5  and not our decision.  And like I said, all contact is

6  monitored.

7          And I just want to say in final is I love my daughter

8  and I'm really proud of the changes that she's made and the

9  life that she's attempting to build for herself.  And if you

10  knew her outside of this courtroom and the reasons that we're

11  here, I really think you'd probably like her a lot too.  She's

12  a lovely person.

13          THE COURT:  Thank you.

14          MS. TERESA EVANS:  Thank you.  And I know I rambled.

15          THE COURT:  That's okay.

16          MS. TERESA EVANS:  I love you.

17          MS. HANANIA:  Your Honor, Gary Evans, Ms. Evans'

18  grandfather, is approaching to also address the Court.

19          THE COURT:  Good afternoon.  Please tell us your name

20  for the record.

21          MR. EVANS:  My name is Gary Evans.  I'm the

22  grandfather of Meggin Evans.

23          THE COURT:  What would you like to say?

24          MR. EVANS:  Good afternoon, Your Honor.  And thank

25  you for giving me the opportunity to speak to the Court this

1    afternoon.  And I'd just like to make some remarks on behalf of

2    Meggin.  My remarks are made with the concurrence of Meggin's

3    family, most of which are here this afternoon.  I'm not ashamed

4    to speak on Meggin's behalf.  I'm ashamed only that she is here

5    charged with what she's being sentenced for today.

6           Some would think that since we're family we believe

7    that Meggin should not be punished.  That would not be true.

8    We believe that appropriate punishment should be imposed, but

9    it should be appropriate.

10          All of my remarks are true to the best of my

11   knowledge, but I could be wrong on some minor details.  It's

12   been very difficult to get any information about the case.  I

13   have tried on two occasions to visit Meggin at the Baker County

14   Jail and have been told both times "no."  So the only

15   information we get is basically from her mother, who gets it

16   from her attorney.

17          From October of 2021 until the children went to live

18   with their grandparents in Alabama in August of '22, the

19   children continued to live with their mother and father.  And

20   during that time Meggin is not alleged to have engaged in any

21   kind of inappropriate activity with her children.  In fact, as

22   it's been stated already, Child Protective Services interviewed

23   all five children and nothing was alleged to have been remiss

24   in their home.

25          Before you sentence Meggin there are some things we

1   believe that you should know about her.  You may not have any

2   knowledge of the good side of Meggin, only the bad, as set

3   forth by the prosecution.  Let me say at the outset that Meggin

4   is not an evil person.  And I hope you believe that, Your

5   Honor.  She is by nature a good person.

6          When her grandmother wondered who would take care of

7   her when she no longer could do it herself, Meggin said, "I'll

8   take care of you, Grandma."

9          When Meggin and her family moved to Florida, life was

10  a constant struggle for them, especially for Meggin.  There was

11  never enough money for food, for the rent, for utilities, for

12  clothing, for car expenses, and all the other expenses of

13  running a household with five children.

14         Brandon, her husband, never held a long-term job.

15  He'd work for a few weeks or a month or two and then quit and

16  look for another job.

17         They moved here from Florida, and they have the same

18  problems there, only it was probably worse there because it was

19  a higher cost-of-living area.  But in November of 2021, I

20  believe it was, Brandon got a job that was going to pay him

21  $42,000 a year; more than he had ever made in his life.  And

22  all he had to do was, with a crew, take care of three

23  cemeteries in the Jacksonville area.  He worked a month and

24  quit.  He wanted to work in the office, in management, but the

25  company said no, so he quit.

1    So that's the kind of life that Meggin had to put up

2    with.  Where was she was going to get the money for food, for

3    rent, and all of the other things?  She was under intense

4    emotional and psychological stress.  And she began to consult

5    with online physicians, which gave her prescriptions for

6    different medication.  In fact, I gave her attorney a list of

7    some -- I believe 20-some different medications that she was

8    taking from time to time.

9    So let me conclude, Your Honor, by saying that Meggin

10   is a good person.  She is a good mother.  In all the turmoil

11   and the chaos and the strife, Meggin always took care of her

12   children.

13   Oftentimes good people do bad things.  And sometimes

14   they get sucked into doing something that they wouldn't

15   ordinarily do.  And in this instance, I'm convinced that that's

16   the case with Meggin.  She would not ordinarily do this.  She

17   loves her children.  Her children love her.  They need her.

18   And she needs them.  Recently her youngest son had a meltdown

19   in school because he wanted his mother.

20   Thank you, Your Honor.

21   THE COURT:  Thank you.

22   MS. HANANIA:  Your Honor, we don't have any other

23   witnesses.  I do believe that Ms. Evans wants to address the

24   Court.

25   THE COURT:  Okay.  Come up, Ms. Evans.

1          THE DEFENDANT:  Good morning, Your Honor.

2          THE COURT:  Or afternoon.

3          THE DEFENDANT:  I'd like to start today by

4    apologizing to my kids.  My children are my whole world.  And

5    they never deserved to be put in this situation.

6          Like my family has said, I've stayed engaged with

7    them the entire time I've been incarcerated.  I call and video

8    chat almost every day; sometimes multiple times throughout the

9    day.  I know who their favorite teachers are, who their friends

10   are, their daily struggles as well as their accomplishments.

11         Even if -- even if I were to apologize to them every

12   day for the rest of my life, it still wouldn't be enough.  I

13   have changed their lives forever because I chose to participate

14   in someone's fantasies.  I've embarrassed myself and I've

15   brought shame on my family.  I thank God every day that my

16   kids, my parents, my grandparents, and my family still love me

17   and support me despite my actions.

18         My parents have given up their retirement years to go

19   back to work and raise and support my five children.  I will

20   never be able to repay them for their sacrifices.

21         I started dating Brandon at the end of my senior year

22   in high school.  I was 18 and he was 20.  From 2007 to 2017 he

23   had several affairs that I knew about.  Each one I found a way

24   to blame myself, and that's probably due to the fact that he

25   was controlling, and little bit by little bit he was chipping

1   away at myself esteem.  It got to a point in our marriage that

2   I was desperate for his attention.  His love was like a drug to

3   me.

4          When he confessed that he watched child sexual abuse

5   material, I went through a range of emotions.  And just like

6   everything else that bothers me, I completely disassociated.

7   I've done this for years in our marriage.  I literally bury

8   things and pretend like they never happened.

9          I eventually started participating in his fantasy

10  through role-playing.  I didn't want him to cheat on me again.

11  And when I saw the reaction I received, I started acting more

12  interested.

13         I accept full responsibility for the part I played.

14  I did not know about his Google searches or the number of files

15  he had on his phone.

16         The day I took the inappropriate picture of my child

17  during a diaper change is a day I wish never would have

18  happened.  I will never forgive myself.

19         As for the text exchanges between us, I promise

20  nothing that was said in those messages was ever going to

21  happen.  They were purely fantasy.  I accept full

22  responsibility for sending them, but I'd like you to know that

23  I deleted those texts and the picture immediately after they

24  took place.

25         I buried it all in the back of my mind so I could get

1  away from the guilt.  It may make me look terrible, but I
2  promise you that is not who I am.
3          My children were never in any danger may.  And DCF
4  and Clay County Sheriff's Office found no indications of abuse,
5  sexual or otherwise.
6          I'd also like you to know that I am sober and
7  clearheaded.  I'm working on my mental health and gaining a
8  deeper understanding of my behaviors.  I have developed a close
9  relationship with God.  And I've learned that my self worth
10  comes from within and not from a man.  I've realized that the
11  love of my children is more than enough -- or is more than I'll
12  ever need.  And I'm learning to let go and let God.  I still
13  haven't learned to forgive myself for the pain I've caused my
14  family, but as I become closer to God I hope I will.
15          I agree that I deserve a just punishment.  I feel as
16  though 15 years of incarceration, the supervised release, and a
17  lifetime as a registered sex offender is more than enough.  I
18  know that my behavior was abhorrent, but please know it was out
19  of character.
20          My children are flourishing and adjusting well, and
21  they are in counseling and coping with the separation.
22  However, I feel that if you take away our ability to talk and
23  to see each other, it will be detrimental to their well-being
24  as well as mine.  Restricting my access to them will serve as
25  punishment to both me and my children.  My kids need me to get

1    through this difficult time.

2            I appreciate your time and consideration.  Thank you.

3            THE COURT:  I do have some questions to ask you,

4    because I know that what you've indicated is this text string

5    is role-play.  It's extremely difficult to read that text

6    string, I have to tell you.

7            THE DEFENDANT:  I agree.

8            THE COURT:  Extremely difficult.  So there are -- you

9    say the children were never at risk, but there is some comment

10   in here regarding Mr. Smolinski touching the chest of your

11   child and you acknowledging that in this conversation.  Can you

12   explain that to me?

13           THE DEFENDANT:  Yes, ma'am.  So he did not touch her

14   on her breast.  He touched her on her shoulder while she was

15   sleeping to see if she was going to wake up, which was

16   inappropriate, I absolutely agree.

17           THE COURT:  But that's not what you said.  You said

18   in your text, "I really didn't think you were going to touch

19   her chest last night, but when you did," and then you continued

20   with -- I won't repeat.

21           THE DEFENDANT:  Right.  The part that you -- that was

22   after that was because -- I don't know what was different, but

23   there was something that was different with him.  The way that

24   he looked at me, the way that he touched me, the way that he

25   loved me during that -- our intercourse that night was

1  different than it was before.  It wasn't -- I don't -- for me,

2  it wasn't because of what he did, it's because of the way that

3  he looked at me.  I don't know what was going through his head.

4  In fact, I don't know a lot of what was going through his head.

5          THE COURT:  Well, we're really not here because of

6  what was going on in his head.

7          THE DEFENDANT:  Right, right.

8          THE COURT:  We're here because of what was going

9  through yours.

10          THE DEFENDANT:  And again, I just wanted him -- I

11  just wanted him to love me.  Even in 2022, when I would -- he

12  still cheated on me even in 2022, that I found out after he had

13  gone to jail.  Our entire marriage was basically him hiding

14  things from me and me always finding a way to blame myself.

15          THE COURT:  Right, and I get that.  I get that.  That

16  does not explain this to me.  That does not explain this

17  conduct to me.

18          Because there are requests for videos in here -- you

19  know, reading through this -- because that's -- I'm looking and

20  I'm thinking, okay, is this role-play?  What is it?  I mean,

21  that's what I'm sort of looking for as I'm reading through

22  these text conversations.  And to some extent perhaps you could

23  say that, but then there's other -- you know, when you're

24  asking for videos and you're talking about the touching your

25  daughter, when you're talking about some of the other things

1    and then actually following through and sending a photograph,

2    it becomes -- it goes beyond just role-play.

3            THE DEFENDANT:  Right.  When I would ask for

4    picture -- or for the videos, it was to let him know that I

5    wanted -- I wanted that intimacy with him.  It wasn't because I

6    wanted to watch it.  I do not find children sexually

7    attractive.

8            THE COURT:  And so when you told him that your

9    preference was between 8 and 13 years --

10           THE DEFENDANT:  It was a made-up number because,

11   again, that's what I had seen of what he had showed me.

12           THE COURT:  Okay.

13           MS. HANANIA:  Thank you, Your Honor.

14           THE COURT:  Anything else?

15           MS. HANANIA:  We don't have anything else, Your

16   Honor.

17           THE COURT:  All right.

18           Ms. Washington.

19           MS. WASHINGTON:  Your Honor, I'm looking at how this

20   case began, which there's been a lot of talk about

21   Mr. Smolinski and the defendant, but certainly it started with

22   an investigation of Mr. Smolinski before it turned to

23   Ms. Evans.  And certainly it was about initially that cyber tip

24   and the sharing of child pornography.  But as the Court

25   correctly noted, the defendant did, in fact, have a role

1    involving greater than one picture.  This isn't a one-picture

2    case.  And as terrible as that picture is, enough to be a

3    one-picture case, there's a lot more that happened here that I

4    think gets lost a little bit.

5        I don't doubt that Ms. Evans has dealt with her fair

6    share of issues, but I think very serious attention needs to be

7    brought back on the numerous children that were exploited by

8    the defendant and her husband in the hope that they would

9    exploit even more.

10       Their text messages, which give us a snapshot into

11   what they're doing but certainly in no way tell us everything

12   that they did, tell us about their interest on both sides that

13   went greater than acting out, role-playing, supporting.  We're

14   not reading messages that say things to the effect of, "Okay,

15   sure."  "Yeah, whatever you want."  They're a lot more active

16   from Ms. Evans.

17       For example, October 22nd, 2021, the defendant shared

18   screen- -- or, excuse me, not the defendant.  Mr. Smolinski

19   shared screenshots of child pornography on his phone only after

20   the defendant requested them so she'd having something to look

21   forward to, and then proceeded to talk about being sexually

22   aroused from that.

23       On October 24th, 2021, the defendant discussed with

24   Mr. Smolinski their daughter and her ten-year-old friend,

25   saying that she walked in -- meaning the defendant -- on the

1    friend of their child peeing and appears to reference the state

2    of her pubic hair and her genitals, and she states that she

3    really wanted to bring her in the bathroom -- meaning her

4    daughter at that point in the conversation -- excuse me, not

5    her daughter, the friend of the daughter, to record it for

6    Mr. Smolinski and find out what that friend knew about sex so

7    that they could understand how much their daughter, in turn,

8    knew about sex, and then asks her husband -- the defendant

9    asking her husband -- if it would turn him on.

10              And then, of course, there was a suggestion offered

11   by Mr. Smolinski on how to do the conversation.  And that is

12   where the touching of the chest conversation also is

13   referenced.

14              And the defendant says she did not think her husband

15   was going to touch her chest, but when he did, she thought it

16   was the most she had been turned on ever and she was glad she

17   gets to explore that with him.

18              And then October 28th, 2021, the defendant and

19   Mr. Smolinski discussed plans for what they would do when their

20   daughter's friends slept over at the home.  Mr. Smolinski said

21   he would give Trazodone -- and he abbreviated TRAZ -- to one of

22   the girls, which can make someone relaxed and drowsy so that

23   his wife could engage in oral sex with him while he touched one

24   of the girls.  Defendant appeared to state she was turned on by

25   it.  And he mentioned possibly sexually assaulting one of the

1    children.  Defendant said she wanted to do the same.

2        They even had this bizarre conversation about driving

3    around the town and he said he would show little girls his

4    penis and the defendant said she could get them to come up to

5    the window for him, and that is where that favorite age

6    conversation come from.

7        On October 28th, 2021, their conversation turned to

8    molesting their own children and the defendant said, "Let's say

9    I really were to let you do whatever you wanted to."  And

10   Mr. Smolinski talked about performing oral sex and other things

11   and said it sounded horrible and he said "we could groom the

12   girls."  And that is when the defendant chose to send that

13   picture.  There isn't a request from Mr. Smolinski for that

14   picture.

15       But when you think about the steps it took to send

16   that, she had to put her phone to her child, she had to take

17   that picture and then send it over.  And it wasn't a, "Whoops,

18   why did I send that to you?"  Instead, the defendant said the

19   child was a little young for her after the defendant --

20   Mr. Smolinski indicated he was sexually excited.  And the

21   defendant stated, "Virgin p-u-s-s-y is a virgin p-u-s-s-y."

22       So it did not show someone who appeared to be

23   bothered or remorseful about what she had just done.

24       On April 14th, 2022, there was even more discussion.

25   So we're talking about six months later that they're talking

1    about exploiting one of their children and her friend.

2    Mr. Smolinski said he needed to set up a camera for when their

3    daughter's friend stayed the night, but he wasn't sure where it

4    should go because he's not sure where she would get naked.

5    Defendant indicated it was their daughter's room, and when the

6    defendant -- excuse me, Mr. Smolinski expressed concern as to

7    whether or not the defendant would be upset if they caught

8    their daughter undressing as well, she indicated she was not

9    concerned.

10          The defendant also raised in that conversation about

11   a rash a child had.  Now, the concern should be the child's

12   rash and hopefully the child would get better, medical care.

13   But instead, this is an opportunity the defendant takes to tell

14   her husband about a way they could exploit the child.  She says

15   that she got up close and personal with one of their children

16   because of a rash she had from not wearing underwear.

17   Mr. Smolinski checked in as to whether the defendant took

18   pictures and told her to go check her rash and spread

19   everything open and to video it.

20          And then they later discussed the daughter's friend,

21   and Mr. Smolinski seemed to ask what her genitals looked like,

22   and the defendant responded about the taste.  And the defendant

23   responded, "It's not like virginity."

24          The defendant gets interviewed on August 11th, 2022,

25   and she admitted she intentionally viewed child pornography

1    multiple times at her residence.  She admitted she received it

2    on her cell phone -- excuse me, from the -- her husband's cell

3    phone.  She knew it was illegal to view, possess, distribute

4    child pornography.  And then she also admitted that she talked

5    about child pornography with her husband after he sent it.

6           She was also asked about the touching of the chest

7    that is referenced, and she admitted that Mr. Smolinski touched

8    their daughter's minor friend's chest over a blanket.

9           In terms of the potential low risk opined by

10   Dr. Rohrer, I would ask the Court to put little value in that

11   report because it really appears that Dr. Rohrer put little

12   effort into the report.

13          She indicates she engages in a two-hour interview

14   with the defendant and looked at the indictment.  There's a

15   number of things produced in discovery:  the interview of the

16   defendant; a large number of text messages, including the ones

17   in the presentence report; there are jail calls between the

18   defendant and her husband to give her a sense of the defendant.

19   None of that was reviewed by Dr. Rohrer.

20          And by her own admission, there's nothing that exists

21   that would enable her to even assess the defendant, because

22   female offenders, there's no risk assessment tool.  And so it's

23   really kind of pulled out of thin air.

24          So I'd ask the Court not to really put much, if any,

25   value into Dr. Rohrer's report other than she holds some doctor

1    credentials and she talked to the defendant.  But I don't think

2    she had enough information to really draw any appropriate

3    conclusions the Court could rely on.

4           Your Honor, the text messages that are in that PSR

5    are an excerpt of the conversations between the defendant and

6    her husband.  But they depict someone who enjoys child

7    pornography and really delights in the exploitation of

8    children, be it their own or others that they have access to.

9           There's talk of grooming their children and sexually

10   abusing them.  This is not a passive person who did not

11   initiate or talk about abusing the children herself, but it was

12   two very active participants.

13          And it's concerning that the five children the

14   defendants have -- or the defendant has range in age from 4 to

15   12 and she claimed her favorite age is 8 to 13.  Maybe it was

16   pulled out of thin air, but it certainly did not match what her

17   husband stated.  So it wasn't just an effort to mirror what he

18   was saying.

19          The defendant's conduct and even her statements today

20   show someone who, as I said, admittedly has had some

21   difficulties but doesn't appear to appreciate the very real

22   harm that she's causing children.

23          Yes, she's upset by the loss of contact with her

24   children in taking a picture, but we didn't hear anything about

25   the fact that she was exploiting her child having a rash; she

was exploiting the child who was coming over; she watched as
her husband exploited a child sleeping over.  I mean, these are
extremely serious things, that she would not only be okay with
exploiting her children, but those belonging to other people,
making her a danger generally.  Any children that came into
contact with the defendant or her husband were unsafe.

        And while these children did not disclose hands-on
abuse, I don't think that means -- that meant these were safe
parents.  It means either they did not recall or there wasn't
sufficient things that happened that were able to rise to that
level.  I think based on the statements alone from the
defendant and her husband, I think they were sufficiently put
in danger by them.

        And Your Honor, it's concerning that one of the
things talked about is low self esteem or the need for
attention is what's spurring these actions.  And so it makes me
think that going forward in the future, under the right
circumstance with a particular person, particular individual,
where she is in her life, would make her a danger to children
if that is something that is the only thing that was required
or part of the reasons that led to her actions in this case in
a variety of areas.

        And so I'm really concerned by the fact that there
was no effort to understand the harm being caused by the child
pornography she was viewing, which is depicting a sexual abuse

1    of children she doesn't know, but then also in terms of a child

2    sleeping over, it may have been only over her clothing, but

3    that's still molesting a child who was entrusted into your

4    care.

5            Your Honor, the guidelines in this case are

6    substantial.  There are two areas in which a toddler is

7    referenced, but I think Congress decided, and the Sentencing

8    Commission has not changed it, that if there is a toddler that

9    is involved, it's serious enough to warrant double counting.

10   Many of our cases do not have the circumstances in which a

11   toddler has two ways to be counted.  But I think here, when

12   it's your own child like that and it's appropriately been

13   assessed as it is here, I don't think that you get a

14   subtraction because it happened to be a toddler and you should

15   somehow get a discount in some way.

16           I think the guidelines here have captured the

17   defendant's conduct.  And I think that the fact that they're

18   higher than her husband's is appropriate.  Mr. Smolinski pled

19   to I believe it was distribution or receipt of child

20   pornography, but certainly he had a 20-year cap.  He was in a

21   different position.  As many horrible things as Mr. Smolinski

22   did, he didn't actually produce child pornography; the

23   defendant did that.

24           And something that the court pointed out when Judge

25   Davis sentenced Mr. Smolinski is he was concerned by those text

1    messages between the two.  So I think that was a very

2    significant factor in this sentence.

3         And so here, Ms. Evans was a party to those texts and

4    a strong participant.  And she took that extra step of taking

5    that picture of her child.  Thankfully her child is young

6    enough that she may never remember what happened to her.  And

7    so that doesn't mean that she is unscarred.  Some day she will

8    probably learn what happened to her and why her mother went to

9    prison and why her mother was convicted.

10        But I think that the defendant's actions here show

11   how dangerous she is to children, and so I do believe a

12   guideline sentence is appropriate for her, Your Honor.

13        THE COURT:  What are your thoughts on the contact on

14   the phone?

15        MS. WASHINGTON:  Your Honor, I would be inclined not

16   to allow the contact.  My agent indicated that there may have

17   been some discussion previously at the earlier stages of the

18   case.  I did not handle the case at that time; my colleague did

19   who's no longer with the office.  So I'm unable to ask her if

20   that was the case.

21        While I know that it would be a hardship to the

22   defendant and her children, I think given the nature of this

23   offense, and that's a routine feature of our sentences, I see

24   nothing in this case to warrant an exception being made in

25   Ms. Evans' case that she should have continued contact.  And

1    that although doctors say they're doing well, it doesn't appear

2    there's anything specific posed to them.  I think that given

3    her particular behavior in this case, I would be concerned

4    about that continued contact going forward.  Yes, it is

5    monitored in some sense, but while these are recorded calls, no

6    one's monitoring every single call and when every single

7    interaction occurs.  And so I would be inclined to have the

8    some position as Mr. Smolinski's case ended up, with him having

9    no contact.  I think Ms. Evans should have the same.

10            THE COURT:  I think in terms of monitoring, beyond

11   the monitoring that they would do at the jail, I think that her

12   mom has indicated that she sits there and listens to it.  And

13   I -- you know, I'm a little torn over that, because normally I

14   wouldn't allow it.  In a typical case I would order no contact

15   at all.

16            MS. WASHINGTON:  Yeah.  And that's, I think, Your

17   Honor, kind of what has happened in my other cases.

18            I think here, that -- I guess I think -- I don't know

19   that Ms. Evans has fully taken responsibility for her actions

20   overall in this case.  I think that she has certainly told the

21   Court a lot about what she has been through, but I think with

22   pushback from Your Honor and with the overall scope of her

23   conduct, it tells me someone who still is not there yet.  And

24   so that's, I think, also what poses a danger in her continuing

25   to have this child interaction without that piece being fully

1   realized or worked on.

2           THE COURT:  Okay.  Thank you.

3           MS. HANANIA:  Your Honor, if I may just respond

4   briefly to a few points.

5           First, I would argue that it would be inappropriate

6   to theorize incidents of abuse that have not been reported and

7   for which there's no evidence.  Ms. Washington talked about,

8   well, perhaps the children don't remember things that happened

9   or they just haven't said it yet.  But there's no evidence of

10  that at all.  And I think it would be inappropriate to impose a

11  harsher sentence than Your Honor otherwise would based on

12  theoretical, speculative, and uncorroborated potential acts,

13  number one.  That would be the first thing, Your Honor.

14          The other thing that I would indicate as far as the

15  children's contact is concerned, I think that the reason so

16  many members of the family come back to that again and again is

17  because they're worried about the kids losing contact.  Yes,

18  they care about Ms. Evans, but they're worried about the impact

19  on the children.  And so given that the contact would be

20  through phone or FaceTime, for limited periods of time, because

21  that's just the way these types of calls work from a prison,

22  you don't have unlimited time to do that, and that they would

23  be monitored by a family member, I don't -- I think that Your

24  Honor could address any potential risks.  I struggle to see

25  where the risk would come when she's behind bars miles --

1    thousands of miles away or hundreds of miles away in talking to

2    these minor children on the phone or by FaceTime about their

3    homework.

4            But nonetheless, if Your Honor perceives that she is

5    some type of threat even if that situation, that could be

6    mitigated by requirement of having supervised contact and by

7    having their mental health provider weigh in, perhaps on a

8    yearly basis, and indicate, "Nope, this still seems to be going

9    well.  They don't seem to be suffering any kind of effects from

10   that."

11           The third thing that I would -- I would indicate,

12   Your Honor, is that regardless of Ms. Washington's [verbatim]

13   actions, I would struggle to agree that Mr. Smolinski is

14   anything other than the primary mover of the events in this

15   case.  That does not minimize Ms. Evans' actions, it's just a

16   reflection of the facts.

17           He is the primary instigator.  He's the person whose

18   behavior over and over again was before the Court with the

19   discrete episodes of downloading and sharing these videos.

20   That's not shifting responsibility from Ms. Evans, it's just an

21   attempt to appropriately put into context each of their

22   behavior in this case.  And to say -- Mr. Smolinski was

23   sentenced to 17 years.

24           THE COURT:  But he wasn't charged with production.

25           MS. HANANIA:  I understand, Your Honor.  But all of

1  these text messages or text chats that Ms. Washington has just

2  referred to were before Judge Davis.  All of the things that

3  were before Judge Davis.  And Mr. Smolinski is the only person

4  who actually physically touched a child.  To argue that

5  Ms. Evans is a more egregious conduct -- I understand as being

6  punished more heavily by the law, but factually speaking, to

7  argue that it's more egregious conduct than Mr. Smolinski's I

8  think is -- is not a fair reading of all the facts in this

9  case.

10         THE COURT:  Is there any indication about whether or

11 not the photograph of her child that was sent to Mr. Smolinski

12 was shared?

13         MS. HANANIA:  My understanding, Your Honor, is it was

14 only just sent to Mr. Smolinski.

15         THE COURT:  Well, no, I'm not talking about whether

16 or not she sent it to anybody else, but did Mr. Smolinski share

17 that image?  Is that image out on the internet?

18         MS. HANANIA:  It's -- I have received no information

19 to indicate that that ever happened, Your Honor.  And I think

20 that that's all I can say to that.

21         These are significant sentences we're talking about.

22 And so all we're asking for Your Honor to do is to keep in mind

23 a sense of proportionality for the behaviors of Ms. Evans in

24 terms of judging her for her behaviors in this particular case,

25 as well as recognizing the mitigating circumstances that we've

1    brought before the Court.

2         Thank you, Your Honor.

3         THE COURT:  Thank you.

4         Ms. Evans, I was going through this case and trying

5    to figure out what an appropriate sentence would be for you.

6    Obviously I have to go through what we call the 3553(a)

7    factors.  There's a whole list of factors that the Court

8    considers; certainly the nature and circumstances of the

9    offense and your history and characteristics.  And those are

10   the main things that the Court is going to look at when it's

11   trying to figure out the rest of the factors.

12        I don't think that there can be a more -- short of

13   killing a child, I can't think of a more serious offense.

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  Your attorney said it, you said it.  I

16   mean, this crime is abhorrent.  It's disturbing.  It's

17   disturbing on many, many levels.  The text messages are

18   disturbing.  The fact that the victims, in your particular

19   count, are your own children -- or your own child, it's

20   extremely troubling.

21        And I asked that question about the distribution

22   because your husband at the time, Mr. Smolinski, is engaged

23   in -- I mean, he's getting child pornography, sharing it with

24   you.  And so he's downloading it, giving it, receiving it,

25   doing whatever he's doing with it.

1    And what you have done is sent a photograph that can

2  then be shared with other people.  And I don't know whether it

3  was shared or not, but the point is that when you take a

4  picture like that and then you produce it and then you send it

5  to somebody who has a similar proclivity and they're engaged in

6  the, you know, back-and-forth on the internet with child

7  pornography, what you've done, essentially, is allowed your

8  child to be out there on the internet so that somebody in, I

9  don't know, China can look at it; somebody in Russia can look

10  at it; somebody down the street can look at it.  It never goes

11  away.  It never goes away.

12    This isn't a situation, you know, pre-internet, where

13  you had a photograph that could be torn up and thrown in the

14  trash.  These photographs, once they are out on the internet,

15  they are out there in perpetuity for anybody who ever wants to

16  look at them.

17    A lot of these children in these videos that are

18  looked at and watched are -- they're, you know -- they're

19  teenagers, they're adults now, and, you know, they're dealing

20  with this forever because every time someone finds their image

21  they're contacted and they have to go through -- they're never

22  allowed closure.

23    That's the danger of sending these photographs out,

24  because they just never go away.  These children become

25  victimized over and over and over and over again.  And I don't

1    think that that's something that people often think about when

2    they engage in this type of behavior.

3              I don't understand -- you know, let's take a look at

4    you.  And I recognize that you have a history of yourself being

5    victimized.  And I don't negate that and I don't wish that on

6    anybody.  And it's not uncommon to have people sitting before

7    me charged with these types of offenses who have, in fact, been

8    victims themselves.  That is -- it's not uncommon.  It's not an

9    excuse, but it's not uncommon.  And I recognize that.

10             I know you have some mental health issues.  I know

11   you have some self esteem issues.  I know you have some

12   addiction issues.  And I, you know, understand what you're

13   saying about your need and your love for your husband and your

14   wanting to please him.  And I cannot imagine engaging in that

15   type of activity.  I can't imagine victimizing my own child

16   because that's what my husband or boyfriend wanted me to do.  I

17   mean, there's got to be a sense of what is right and what is

18   wrong.

19             And I get that people make mistakes.  You have made a

20   very grave one.  But you have got the support of your family,

21   and that is something that many people that sit before me do

22   not have.  And so for that you are blessed.  And I believe your

23   children are blessed because they have their grandparents that

24   are willing to take care of them.

25             And I hope that they don't know anything about this.

1 I hope and pray that they never know about this and we're not

2 talking about repressed memories or anything like that.  I hope

3 that they don't.  I don't know that I -- I don't know the

4 answer to that question, and only time will tell.  But

5 thankfully they are with, you know, loving people that are

6 going to take care of them and see to it that their needs are

7 met.  And it appears as though they're doing well in school,

8 and that's a plus.

9              THE DEFENDANT:  Yes, ma'am.

10              THE COURT:  So the sentence that I impose has got to

11 reflect the seriousness of the offense, it has to promote

12 respect for the law, and it has to provide a just punishment

13 for you.

14              And some of the things that we look at are, you know,

15 deterrence.  What's going to deter you and what's going to

16 deter like-minded people from engaging in further criminal

17 activity.  What's going to protect the public -- in this

18 particular case children -- from further crimes.  And then

19 other things the Court looks at, you know, getting you

20 treatment that you need.

21              And then I consider the sentences available to me,

22 the range established by the guideline, the statutory range,

23 the minimum mandatory in your case.  I've considered,

24 certainly, Mr. Smolinski's sentence and what he received

25 because the Court does have to consider, you know, sentencing

1   disparities.

2          But this is not an apples-to-apples case, you know.

3   We're looking at an individual who in his activity is

4   abhorrent.  I mean, there's nothing good about it at all.  But

5   he was charged with something different than you were.  I mean,

6   he was not charged with producing child pornography and you

7   were.  And so you're here on two totally different charges and

8   with different consequences, different minimum mandatory

9   sentences.  Entirely different consequences.

10          Let's talk about deterrence.  Deterrence can be

11  general or it can be specific.  And I -- there's some cases

12  where I think that general deterrence is a factor.  And I'm not

13  so sure that what I sentence you today is going to deter any

14  like-minded individuals from engaging in this activity.

15  Perhaps it might deter somebody that is in your situation,

16  where you're trying to please somebody else by engaging in

17  this, if that's, in fact, the reason for it.  But what's going

18  to specifically deter you from committing future crimes?  And I

19  think that we look at that closely.

20          But more important than anything else that I have

21  considered in your case is to protect children, particularly

22  your own, but children in general, because this case involved

23  not only your own children, but it involved a friend -- a

24  childhood friend of one of your children, in conversations

25  and -- regarding that child and, you know, conversations with

1   the child's mother about sleepovers and whatnot and sharing

2   that so that, you know, we can have this child over to the

3   house again, engage in whatever activity.  And so that

4   certainly is a concern.  We're not -- concerning because this

5   was not -- this crime and this -- while the production is only

6   dealing with your child, the total of the activity did not only

7   involve your children, it involved a friend and it involved the

8   children on the videos that you watched.

9          And left untreated -- and quite frankly, I have to

10  say, with the doctor's report, I -- first of all, there's --

11  you know, I mean, I know that Dr. Rohrer believed that she was

12  at low risk to re-offend, but not on the heels of "but there's

13  no real test."  And I don't think you ever can really fully

14  know whether somebody's going to re-offend or not.  I'd like to

15  hope that that doesn't happen.

16         But I find it odd that Dr. Rohrer didn't believe that

17  any sex-offender-specific treatment was warranted in this case.

18  I found that to be interesting given the nature and

19  circumstances of this offense, because regardless of whether

20  there was a proclivity, regardless of whether this started as

21  trying to please Mr. Smolinski, eventually -- and I'm just

22  going by what I've read throughout -- eventually, trying to

23  please Mr. Smolinski became an integral part of who you were at

24  the time that you were committing these offenses, which I think

25  warrants some treatment, because without it I believe that you

1    pose a danger to children.

2         (Pause in proceedings.)

3         THE COURT:  So after considering all of the 3553(a)

4    factors, after considering your statement, the argument of

5    counsel, considering all of the letters that were written on

6    your behalf -- and you do have -- your family loves you very

7    much, and they support you.  Not a single person said anything

8    to justify your conduct.  They all agreed that your conduct was

9    horrific.  But they -- you know, all of them explained the

10   person that they know you to be.

11        And I gathered, eventually, that one of the -- or a

12   couple of those letters that were attached were from your

13   fellow inmates at the jail, who also speak very highly of you

14   and how much you've helped them.  And I think that's a

15   testament to you.  And you're going to have a lot of time to

16   serve.  And I hope that you use that time wisely and continue

17   to help other young women that are incarcerated.

18        But you have a lot of support.  And it pains me to

19   sit up here and listen to your mom and listen to your

20   grandfather, you know, because, you know, I'm a parent, you

21   know, and it would -- it's very difficult, and it would hurt me

22   to have to stand up and speak on behalf of one of my children,

23   somebody that I love very much.  And they do love you.  And

24   their requests did not fall on deaf ears.  It's just a very

25   difficult decision to make in your case.

1          So after reviewing everything that I had mentioned

2    earlier and listening to arguments of counsel and everyone,

3    it's the judgment of the Court, Ms. Evans, that you're

4    committed to the custody of the Bureau of Prisons to be

5    imprisoned for a term of 262 months, which is the low end of

6    the guidelines.

7          Upon release from imprisonment you will serve a

8    20-year term of supervised release.  While on supervised

9    release you will comply with the mandatory and standard

10   conditions adopted by the Court in the Middle District of

11   Florida, which can be found in Section 5D1.3(a) and (c) of the

12   United States Sentencing Guidelines.

13         And in addition, you'll comply with the following

14   special conditions:

15         You'll participate in a substance abuse program,

16   either outpatient on inpatient.  You'll follow the probation

17   officer's instructions regarding the implementation of this

18   directive.  And you'll contribute to the cost of these services

19   not to exceed an amount determined reasonable by the Probation

20   Office.  And they have a sliding scale.  And during and upon

21   completion of this program you will submit to random drug

22   testing.

23         You'll participate in a mental health treatment

24   program, again, either outpatient or inpatient.  You'll follow

25   the probation officer's instructions regarding this program.

1    And you will, again, contribute to the cost based on their

2    sliding scale.

3            In addition, you'll participate in a mental health

4    program specializing in sexual offender treatment.  And you'll

5    submit to polygraph testing for treatment and monitoring

6    purposes.  You'll follow the probation officer's instructions

7    regarding the implementation of the directive.  You'll

8    contribute to the cost of the treatment and/or the polygraphs.

9    And that's not to exceed an amount determined reasonable by

10   Probation and based on your ability to pay.

11           You will register with the state sexual offender

12   registration agency in any state where you reside, visit,

13   anywhere you're employed or where you carry on any type of

14   vocation or where you're a student.  And that's as directed by

15   your probation officer.  So whether you go back to Alabama or

16   whether you stay in Florida, whatever each state's requirements

17   are, you have to abide by those.

18           And the probation officer will provide the state

19   officials wherever you reside, and certainly under the Florida

20   sexual predator and sexual offender notification registration

21   statutes, as well as the Sex Offender Registration and

22   Notification Act.  And they'll direct you to report to these

23   agencies personally for required additional processing.  So

24   they will take photographs and fingerprints and whatnot.

25           You will have no direct contact with any minor under

1    the age of 18 without the written approval of your probation

2    officer.  And you'll refrain from entering into any area where

3    children frequently congregate, including schools, daycare

4    centers, theme parks, playgrounds, et cetera.

5              With regard to your own children, the no contact is

6    going to be in effect for those children until -- unless and

7    until I receive a report from their counselor.  I want to find

8    out what the counselor has to say with regard to contact, and

9    then I will reevaluate that provision when I hear from the

10   children's counselors.

11             If you can make sure that that happens, Ms. Hanania,

12   and that way -- and then get that report and then I can

13   reevaluate.  But right now, no contact until that's done.

14             What is paramount to me, and most important to me in

15   all of this, is the health -- mental health and physical health

16   of your children.  And they are innocent victims in this.  And

17   so that's the most important thing.

18             But I do agree with Judge Davis regarding

19   Mr. Smolinski, and he should not be having any contact with his

20   children at all.

21             But I -- you know, the kids apparently appear to be

22   doing well in school.  And so I would like a full evaluation of

23   them with regard to the effects of no contact.

24             But when you're released you cannot go anywhere where

25   children regularly congregate.  So that is like schools,

1    daycare centers, parks, playgrounds, amusement parks, anything

2    like that, okay?

3            You're prohibited from possessing, subscribing to, or

4    viewing any images, videos, magazines, literature, or other

5    materials depicting children in the nude or in sexually

6    explicit positions.

7            Without prior written approval of your probation

8    officer you are prohibited from either possessing or using a

9    computer, including a smart phone, a handheld computer device,

10   a gaming console, or an electronic device capable of connecting

11   to an online service or an internet service provider.  This

12   prohibition includes a computer at a public library, an

13   internet cafe, your place of employment, or any educational

14   facility.

15           And also, you're prohibited from processing any

16   electronic storage data medium, so like a flash drive or a

17   compact disk, floppy disk, or using any data encryption

18   technique or program.  If you're approved to possess such a

19   device, then you must permit routine inspection of it,

20   including the hard drive or any other electronic storage

21   medium.  And that's to confirm that you're adhering to this

22   program.

23           And the United States Probation Office would conduct

24   that inspection in a manner no more intrusive than is necessary

25   to ensure compliance with this condition.  So if you're working

1   for someone and this condition might affect your employer, then

2   you need to inform your employer of this restriction, including

3   the inspection.

4        And again, right now there's no contact with the

5   victims identified in this case, particularly in -- of the

6   child that was photographed.  But I will wait and reevaluate

7   that restriction after hearing from the counselors or doctors.

8   If the Court alters that in any way, then that contact would

9   not be unsupervised.  It would have to be supervised contact.

10       You will submit to a search of your person, your

11  residence, place of business, any storage units under your

12  control, your computer, your vehicle.  This will be conducted

13  by the United States Probation Officer at a reasonable time and

14  in a reasonable manner based upon a reasonable suspicion of

15  contraband or evidence of a violation of your condition of

16  release.

17       And so if you're living with somebody, you need to

18  make sure that they are informed of this search provision

19  because a failure to submit to a search could be grounds to

20  revoke your supervision.

21       You'll be prohibited from incurring new credit

22  charges or opening additional lines of credit or obligating

23  yourself for any major purchases without the approval of your

24  probation officer.  And again, that's to just ensure adherence

25  to these conditions.  And you'll provide your probation officer

1    access to any requested financial information.

2              You'll refrain from engaging in any employment

3    related to the direct contact with minors.

4              Having been convicted of a qualifying felony, you'll

5    cooperate in the collection of DNA as directed by your

6    probation officer.

7              You'll refrain from any unlawful use of a controlled

8    substance.

9              You'll submit to one drug test within 15 days of

10   placement on supervision and at least two periodic drug tests

11   thereafter as directed by your probation officer.  And you'll

12   submit to random drug testing not to exceed two tests per week.

13             You got a lot of time.  I don't know of any drug that

14   stays in your system that long.  But I also didn't just fall

15   off the turnip truck, and I know that there are ways to get

16   drugs in prison.  Stay away from it --

17             THE DEFENDANT:  Yes, ma'am.

18             THE COURT:  -- because when you are released -- and

19   you will be released, and you're still going to be relatively

20   young when you're released -- you know, you're going to be

21   tested within 15 days.  And that's going to be negative,

22   correct?

23             THE DEFENDANT:  Absolutely.

24             THE COURT:  Okay.  Based on your financial status I

25   will waive imposition of a fine in your case.

1          Were there any forfeiture matters?

2          MS. WASHINGTON:  No, Your Honor.  They were all

3    handled through the -- Mr. Smolinski's case.

4          THE COURT:  Okay.  You are ordered to pay the United

5    States a special assessment of $100, which is due immediately.

6          And I find that because you're indigent, the

7    assessment, pursuant to Title 18 of the United States Code,

8    Section 2259A, the AVAA assessment and well as the -- what it

9    is, the JVTA, that assessment?

10          MS. WASHINGTON:  Yes, Your Honor.

11          THE COURT:  I'll waive those assessments.

12          I will recommend -- I don't have the authority to

13    order you to a particular institution.  I can put a

14    recommendation in the judgment, and I will do that.  I will

15    recommend Aliceville.  And if that is unavailable I will

16    recommend that they look elsewhere in the state of Alabama so

17    that you can be close to your family.

18          If there is not -- if that facility is not available

19    and there's not another facility in that state that's

20    available, I will request that they look to the next closest

21    available facility before they send you to like Oregon or South

22    Dakota or someplace, okay?

23          Are there any programs that you're interested in me

24    recommending you for?

25          THE DEFENDANT:  At this point, I'm going to -- I have

1    enough time to do them all.

2            THE COURT:  Well, I mean, do you have like a

3    vocational interest or anything that you would like me to

4    recommend you for?

5            THE DEFENDANT:  I was thinking about doing

6    cosmetology.

7            THE COURT:  Okay.

8            THE DEFENDANT:  But then I'm also interested in

9    welding and the HVAC and working with my hands.

10           THE COURT:  Okay.  So I'll recommend you for any

11   vocational programs that they have, whether it be welding,

12   HVAC, cosmetology, or really any program that's available at

13   the institution I'll recommend you for.

14           I'll also recommend you for substance abuse treatment

15   and mental health treatment while you are at the facility as

16   well.

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  After considering the advisory sentencing

19   guidelines and all the factors identified in Title 18 of the

20   United States Code, Sections 3553(a)(1) through (7), the Court

21   finds that the sentence imposed is sufficient, but not greater

22   than necessary, to comply with the statutory purposes of

23   sentencing.

24           The Court accepted your plea agreement because it

25   believes that it was -- that it adequately reflected the

1    seriousness of the actual offense behavior and that accepting

2    the plea would not undermine the statutory purposes of

3    sentencing.

4         Under the plea agreement you entered a guilty plea to

5    Count One in return for the dismissal of Counts Two and Three.

6    So in accordance with your plea agreement, it's ordered that

7    Counts Two and Three of the indictment are dismissed against

8    you.

9         The Court having pronounced sentence, does counsel

10   for the government or counsel for Ms. Evans have any objection

11   to the sentence imposed or the manner in which the sentence was

12   imposed?

13        MS. WASHINGTON:  None by the government, Your Honor.

14        MS. HANANIA:  We do not have any objections, Your

15   Honor.  I would ask to address a couple points either now or at

16   the end, however Your Honor wants.

17        THE COURT:  You can go ahead now.

18        MS. HANANIA:  Thank you, Your Honor.

19        I was wondering if the Court would consider including

20   language that would allow the transfer of Ms. Evans' supervised

21   release to Alabama.  And that would allow her, upon release, to

22   be released there.

23        THE COURT:  I don't have any objection to that.

24   However they -- however they handle that or do that, that's

25   fine.

1          MS. HANANIA:  Okay.

2          And in terms of the report from the counselor, Your

3    Honor, I will -- I will reach out to that counselor, ask them

4    to do the type of report Your Honor wants, and then file it

5    under seal along with a motion.  Would that be right?

6          THE COURT:  That's correct.

7          MS. HANANIA:  Okay.

8          The last thing I'd ask Your Honor to consider is that

9    given the length of Ms. Evans' sentence, would Your Honor be

10   willing to include language that would substitute monitoring

11   software for the prohibition against device -- internet

12   devices?  Because I do -- my feeling is that's where we're

13   going to be in 15 or 20 years' time, is monitoring software

14   that's placed on probationers or somebody who's being

15   supervised to monitor their usage.

16         THE COURT:  Well, I'm not going to add that now, but

17   whatever -- we can take that up when the time comes.

18         MS. HANANIA:  Thank you, Your Honor.

19         THE COURT:  Make sure I got everything.

20         Ms. Evans, you're hereby remanded to the custody of

21   the United States Marshal to await designation by the Bureau of

22   Prisons.

23         To the extent permitted by your plea agreement, you

24   have the right to appeal from the judgment and sentence within

25   14 days of the entry of the judgment.  Failure to file an

1    appeal within that 14-day period would waive your right to

2    appeal.  The government also has the right to appeal.

3         You have the right to the assistance of counsel in

4    taking an appeal.  If you cannot afford an attorney to

5    represent you, then the Court would appoint somebody to

6    represent you.  And if you could not afford the filing fee,

7    then the Court would direct the Clerk of Court to accept your

8    Notice of Appeal without such a fee.

9         Good luck to you.

10         THE DEFENDANT:  Thank you.

11      (The proceedings concluded at 3:22 p.m.)

12                      -    -    -

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3   UNITED STATES DISTRICT COURT)

4   MIDDLE DISTRICT OF FLORIDA )

5

6        I hereby certify that the foregoing transcript is a true

7   and correct computer-aided transcription of my stenotype notes

8   taken at the time and place indicated herein.

9

10       DATED this 3rd day of June, 2025.

11

12                        /s/ Katharine M. Healey
                          Katharine M. Healey, RPR, RMR, CRR, FPR-C
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25